FILED
HARRISBURG, PA

MAR 3 1 2008

MARY E. D'ANDREA, CLERK
Per
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL ACTION |
| | : No. 4:05-cr-0402 (Jones, J.) |
| v. | : |
| | : |
| JOHN J. RIGAS and | : |
| TIMOTHY J. RIGAS | : |
| Defendants. | : |

## DEFENDANTS' BRIEF IN SUPPORT OF
## THEIR MOTION TO DISMISS THE INDICTMENT ON
## DOUBLE JEOPARDY AND COLLATERAL ESTOPPEL GROUNDS

### DILWORTH PAXSON LLP

JOSEPH U. METZ, ESQUIRE
PA Attorney I.D. No: 32958
112 Market Street, 8th Floor
Harrisburg, PA 17101

LAWRENCE G. MCMICHAEL, ESQUIRE
PA Attorney I.D. No: 28550
1735 Market Street, Suite 3200
Philadelphia, Pennsylvania 19103

*Attorneys for Defendants,*
*John J. Rigas and Timothy J. Rigas*

722877_6

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I.    INTRODUCTION ...................................................................................1

II.   PROCEDURAL HISTORY ....................................................................3

III.  STATEMENT OF FACTS ......................................................................4

IV.   ARGUMENT ..........................................................................................9

   A.  General Principles Of Double Jeopardy And Collateral Estoppel .................. 9

   B.  The Conspiracy Count (Count I) Should Be Dismissed Because It
       Constitutes The Same Offense The Rigases Were Convicted Of In The
       Earlier Criminal Trial. ................................................................................10

      1.  Legal standard. ........................................................................................11

      2.  The Rigases have made a non-frivolous showing that there existed a
          single conspiracy. ..................................................................................14

         (a)  The conspiracies share a common locus criminis. ...................................14

         (b)  The conspiracies have a significant degree of temporal overlap ............15

         (c)  The conspiracies have a significant degree of personnel overlap. .........16

         (d)  The conspiracies charge similar overt acts undertaken and roles
              played by the defendants. ....................................................................18

            (i)  The overt acts charged in each indictment substantially overlap. ......18

            (ii) The indictments allege that John and Tim played central roles in
                 both conspiracies. ..................................................................................21

   C.  The Tax Evasion Counts (Counts II-VII) Should Be Dismissed Because
       The Rigases Were Previously Acquitted Of An Element Necessary To
       Sustain Convictions On These Counts. .......................................................22

      1.  The Rigases' prior acquittals established that they did not "steal" or
          "divert" Adelphia's corporate assets. ..........................................................23

      2.  The Government cannot prosecute the Rigases for failing to pay taxes
          on diverted corporate assets that the Rigases were acquitted of
          diverting. ................................................................................................26

V.    CONCLUSION ....................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                               <u>Page</u>

*Ashe v. Swenson,*
    397 U.S. 436 (1970) ........................................................................... 9, 10, 23, 24

*James v. United States,*
    366 U.S. 213 (1961) ........................................................................................28

*United States v. $184,505.01 in U.S. Currency,*
    72 F.3d 1160 (3d Cir. 1995) ............................................................................9

*United States v. Becker,*
    892 F.2d 265 (3d Cir. 1989) ........................................................................ 3, 11

*United States v. Brown,*
    No. 89-463-02, 1991 U.S. Dist. LEXIS 598 (E.D. Pa. 1991) .............................13

*United States v. Cen-Card Agency/C.C.A.C.,*
    724 F. Supp. 313 (D. N.J. 1989).....................................................................24

*United States v. Crispino,*
    586 F. Supp. 1525 (D. N.J. 1984)............................................................ 26, 27, 29

*United States v. Felton,*
    735 F.2d 276 (3d Cir. 1985) ...........................................................................15

*United States v. Inmon,*
    568 F.2d 326 (3d Cir. 1977) ...................................................................... 11, 13

*United States v. Kamins,*
    479 F. Supp. 1374 (W.D. Pa. 1979) ................................................................23

*United States v. Keller,*
    624 F.2d 1154 (3d Cir. 1980) .........................................................................10

*United States v. Liotard,*
    817 F.2d 1074 (3d Cir. 1987) ..................................................................*passim*

*United States v. Mezvinsky,*
    206 F. Supp. 2d 661 (E.D. Pa. 2002)................................................................24

*United States v. Mock,*
    604 F.2d 341 (5th Cir. 1979) ................................................................ 27, 28, 30

*United States v. Smith,*
    82 F.3d 1261 (3d Cir. 1996) ...................................................................*passim*

722877_6

*United States v. Standefer,*
  610 F.2d 1076 (3d Cir. 1979) ........................................................ 9, 10

*United States v. Triano,*
  393 F. Supp. 1061 (D. N.J. 1975)......................................................22

*United States v. Venable,*
  585 F.2d 71 (3d Cir. 1978) ........................................... 9, 10, 22, 28, 29

*United States v. Yancy,*
  No. 94-366-2, 1995 U.S. Dist. LEXIS 12869, (E.D. Pa. Sept. 7, 1995) ..............11

*United States v. Young,*
  503 F.2d 1072 (3d Cir. 1974) ..........................................................11

## Statutes/Constitutional provisions

U.S. Const. amend. V..........................................................................9

18 U.S.C. § 1343 ......................................................................... 23, 24

26 U.S.C. § 7201 ..............................................................................27

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | No. 4:05-cr-0402 (Jones, J.) |
| v. | : | |
| | : | |
| JOHN J. RIGAS and | : | |
| TIMOTHY J. RIGAS | : | |
| Defendants. | : | |

## DEFENDANTS' BRIEF IN SUPPORT OF
## THEIR MOTION TO DISMISS THE INDICTMENT ON
## DOUBLE JEOPARDY AND COLLATERAL ESTOPPEL GROUNDS

John J. Rigas and Timothy J. Rigas (collectively "the Rigases"), by and through their undersigned counsel hereby submit this Brief in support of their Motion to Dismiss the Indictment.

## I.    INTRODUCTION

The Rigases file this Motion in order to estop the Government from bringing a second prosecution relating to the same actions for which the Rigases have already been tried in the United States District Court for the Southern District of New York ("S.D.N.Y").

The Rigases are former officers and directors of Adelphia Communications Corporation ("Adelphia"). During the period covered by the indictment, Adelphia was a cable television company with a corporate headquarters in Coudersport, Pennsylvania. In September 2002, the Rigases were indicted in S.D.N.Y. for, *inter alia*, wire fraud and conspiracy to commit wire fraud based on the Rigases' alleged

looting of Adelphia. At the conclusion of trial in July of 2004, the Rigases were acquitted of wire fraud and conspiracy to commit wire fraud; however, they were convicted on other counts, including bank fraud, securities fraud and conspiracy to commit bank and securities fraud. The Rigases are currently serving sentences in connection with these convictions.

The Government's theory in the instant tax evasion case is that the Rigases stole money or stock from Adelphia and, as a result, should have paid federal taxes on the allegedly ill-gotten gains. Additionally, the Government alleges that the Rigases participated in a conspiracy to divert funds from Adelphia without paying income taxes. They cannot be tried again on these same claims. In the 2004 S.D.N.Y. criminal proceeding, the Rigases were charged with numerous counts of wire fraud. The Government's wire fraud theory in that case was exactly the same as its underlying theory here – namely, that the Rigases stole money or stock from Adelphia by disguising the transfers as loans or inter-company receivables. In acquitting the Rigases of wire fraud and conspiracy to commit wire fraud, the jury necessarily rejected the Government's theory.

The specific transactions that have been identified by the Government as the basis of the instant tax evasion indictment were each part of the case presented by the Government in the S.D.N.Y. proceedings. The principle of collateral estoppel therefore prohibits the Government from relitigating the issue of whether those

2

transactions constituted "looting" of Adelphia property.  Although the current indictment adds a "taxable event" layer to the claims, in both this and the earlier case it was the outflow of alleged Adelphia property that serves as the basis for the Government's charges against the Rigases.  Thus, the jury's acquittal – and rejection of the Government's argument on this point – defeats a necessary element of the charge against the Rigases.  Accordingly, the tax evasion counts must be dismissed.

Similarly, the conspiracy count against the Rigases cannot survive without violating the constitutional prohibition against Double Jeopardy.  Controlling Third Circuit case law prohibits the Government "from splitting one conspiracy into several prosecutions." *United States v. Becker*, 892 F.2d 265, 268 (3d Cir. 1989). Yet, it is plain that the conspiracy for which the Rigases are now charged is the same one for which they were already tried in the Southern District of New York. The time, place, location, overt acts and participants in the alleged conspiracies charged in each indictment are substantially – if not entirely – identical.  Thus, the conspiracy count against the Rigases should be dismissed as well.

## II.    PROCEDURAL HISTORY

This case began with an indictment filed against the Defendants on October 6, 2005 ("Indictment"), over a year after the jury verdict in the S.D.N.Y case.  A copy of the Indictment is attached hereto as Exhibit "A."  Though this case was

722877_6

3

technically initiated in 2005, the government began investigating the Rigases as far back as 2002. Instead of consolidating all charges into a single proceeding, the Government chose, instead, to bring two prosecutions based on substantially similar facts. The scheduling order signed by the Court on February 19, 2008 set a due date for pre-trial motions of April 15, 2008, with trial scheduled to begin in July of 2008.

## III.   STATEMENT OF FACTS

On September 23, 2002, the Rigases, along with Michael Rigas and Michael Mulcahey, were indicted by a grand jury sitting in the Southern District of New York. A superseding indictment was subsequently obtained on July 30, 2003 ("S.D.N.Y. indictment"). A copy of the S.D.N.Y. indictment is attached hereto as Exhibit "B." The Government later supplemented the S.D.N.Y. indictment with a bill of particulars filed on January 2, 2004 ("Bill of Particulars"). A copy of the Bill of Particulars is attached hereto as Exhibit "C."[1] The S.D.N.Y. indictment included a count for conspiracy. Ex. B, ¶ 198.

In pursuing wire fraud charges against the Rigases, the Government's theory was plainly that the Rigases had acted with the specific intent of causing harm to Adelphia by, among other things, looting it of cash and stock. Indeed, in

---

[1] The Bill of Particulars was filed under seal in the S.D.N.Y. case. Although the Rigases do not object to the filing of the Bill of Particulars of public record, given Judge Sand's prior rulings in the S.D.N.Y. case, they are nonetheless filing it under seal in this case.

722877_6

addressing the wire fraud charges in their closing arguments to the jury at the

conclusion of the 2004 S.D.N.Y. trial, the Government could not have been clearer

on this point:

> Wire fraud is just a scheme or plan to obtain money or property by false or misleading representations or promises in connection with the use of the interstate wires. **It's simply a plan to trick someone, ladies and gentlemen, to get money or property from them. And that plan to trick someone has to use the interstate wires. That's wire fraud.**
>
> In particular, the indictment charges that these defendants made misleading representations and false promises, and failed to disclose important facts to the public, in furtherance of a plan to help members of the Rigas family obtain money and property from Adelphia. Some good examples of the misrepresentations that were used are the lies and the misleading omissions that are contained in Adelphia's securities filings. And in particular, some of the misrepresentations include failing to disclose the affiliate transactions that I was just talking about. Those are misleading omissions, failing to tell the public things they needed to know. And those omissions were made to help cover up and **help allow the Rigas family to continue to take money and property from Adelphia.** Stock is property. Bonds are property. Real estate is property. Money, certainly cash, is money.

[Criminal Trial Transcript ("Crim Tr."), 10447-48 (emphasis added); a copy of

which is attached hereto as Exhibit "D"].

On July 8, 2004, the jury returned a general verdict as outlined above. A

copy of the S.D.N.Y. jury verdict is attached hereto as Exhibit "E."

Over a year after the verdict in the S.D.N.Y. case, on October 6, 2005, a grand jury sitting in the Middle District of Pennsylvania indicted the Defendants for conspiracy (Count I) and multiple counts of tax evasion (Counts II-VII). *See* Ex. A. By letter dated August 27, 2007, the Government provided counsel with a series of specific transactions which it contends constituted theft from Adelphia and, therefore, gave rise to a tax liability for the Rigases during the Indictment period. A copy of that letter and selected exhibits annexed thereto is attached hereto as Exhibit "F." The transactions identified by the Government as the basis for the tax evasion claims relate in some way, for the most part, to certain purchases of Adelphia securities by the Rigases between 1998 and 2000. For example, the Government contends that the Rigases stole money or securities from Adelphia in connection with (1) the Rigases' purchase of $24.9 million of Adelphia securities on the open market in October, 1999; (2) the Rigases' purchase of $100 million of Adelphia subsidiary (ABIZ) bonds in March, 1999; and (3) the Rigases' purchase of $368 million of Adelphia securities in January, 2000. *See* Ex. F at Appendix B.

The Government, however, already contended at the S.D.N.Y. trial that, with respect to *the exact transactions at issue here*, the Rigases "stole" either Adelphia cash or securities. For instance, during closing, the Government argued the following:

Now, I think it was before lunchtime that I talked about the three chapters that will help organize the conspiracy in this case. **And the first chapter that I mentioned to you was the crooked securities deals that these men caused Adelphia to enter into with the Rigas family.** And at this trial, you learned about three ways that the Rigas family bought Adelphia stock between 1999 and 2002.

First, there was Adelphia stock that the Rigas family bought on the open market. And they bought that stock with Adelphia cash, but they kept it themselves. Second, there were the securities deals where Adelphia paid money for stock to Adelphia, but once they got the stock, they took the money back too. And then, third, the deals you have heard a lot of testimony about, where the Rigas family didn't pay any money to Adelphia at all, and just took stock in exchange for the signing of misleading cross-receipts saying that the stock had been paid for.

[Ex. D at 10469-70]. The Government went on and specifically identified all of the transactions at issue here as thefts of Adelphia cash or securities by the Rigases, including the specific transactions described above:

> **We have the Rigas family getting $24.9 million of cash out of Adelphia, buying stock for itself.** 500,000 shares. And you learned from Mr. Helms as well as from Mr. Brown and even Mike Mulcahey admitted this, that when the Rigas family took this cash from Adelphia, they didn't sign a loan agreement, they didn't sign a note, they didn't sign a contract, they didn't fill out an IOU. They didn't sign anything, not a single document agreeing to pay this money back to Adelphia. . . . They took Adelphia's money, and there was no promise by anybody to pay it back to Adelphia.

***

722877_6

**This is the 1999 ABIZ bond transaction.** . . . What happened very briefly was, Hilton Head Communications, in the left-hand bottom corner, borrowed $100 million from a Rigas credit facility, a credit facility that Adelphia had no obligation to pay back. It transferred that money to Highland Holdings, who paid cash to ABIZ of $98.4 million for bonds, and then Highland Holdings got $100 million worth of ABIZ bonds. That all happened on March 2, 1999. And if it stopped there, this would have been a fair transaction. But what happened on March 15, 1999 is that ABIZ took that $100 million and sent it over to Adelphia. And then Adelphia gave the $100 million, in the dotted line on the bottom of this chart, on the same day to Hilton Head to pay down the same borrowing Hilton Head used to buy the bonds. **Adelphia just gave the cash right back to the Rigas family.**

\* \* \*

Now, if we look at Government's Exhibit 11164AR . . . **What you see is that Adelphia, on the bottom here, gave the Rigases 5.9 million shares of Adelphia stock worth $368 million. And Highland and Hilton Head, the Rigas entities, didn't give Adelphia any money. Zero dollars,** despite the promise that Highland Holdings would pay for the stock in cash.

[*Id.* at 10471, 10488-89, 10534-35.]

In short, every one of the transactions which the Government alleges in this case constituted "diversion" of either Adelphia cash or securities by the Rigases was previously the subject of the Government's wire fraud claims in the 2004 criminal trial. Similarly, the conspiracy alleged in this case is the same conspiracy that was previously at issue in the S.D.N.Y. trial.

722877_6

## IV.   ARGUMENT

### A.   General Principles Of Double Jeopardy And Collateral Estoppel

The Double Jeopardy Clause of the Fifth Amendment provides that no person may "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V.  The Clause protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *United States v. $184,505.01 in U.S. Currency*, 72 F.3d 1160, 1165 (3d Cir. 1995).

The related doctrine of collateral estoppel has been utilized to prevent relitigation of an issue resolved in an earlier proceeding.  In criminal cases, the common-law principal of collateral estoppel has constitutional roots in the Double Jeopardy Clause's protection against a defendant having to relitigate issues previously decided in his favor.[2] *United States v. Standefer*, 610 F.2d 1076, 1092 (3d Cir. 1979); *see also Ashe v. Swenson*, 397 U.S. 436, 445 (1970) ("[t]he ultimate question to be determined ... is whether [collateral estoppel] ... is embodied in the Fifth Amendment guarantee against double jeopardy.  We do not hesitate to hold that it is.").

---

[2] Collateral estoppel, of course, may also be used to preclude the prosecution – by way of a motion *in limine*, from raising facts in the second proceeding previously determined in the defendant's favor at an earlier trial. *United States v. Venable*, 585 F.2d 71, 78 (3d Cir. 1978).

722877_6

Collateral estoppel serves the "dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *United States v. Keller*, 624 F.2d 1154, 1157 (3d Cir. 1980) (internal quotations omitted). In the criminal context, application of collateral estoppel doctrine also serves one of the fundamental purposes of the Double Jeopardy Clause: protecting citizens from repetitive and harassing Government trials. *Standefer*, 610 F.2d at 1092; *see also Ashe*, 397 U.S. at 445-46 ("For whatever else [the Fifth Amendment] may embrace, it surely protects a man who has been acquitted from having to 'run the gauntlet' a second time.").

Thus, collateral estoppel applies against the government wherever "facts determined in favor of a criminal defendant in the prosecution of one offense are sought to be established adversely to the defendant in a subsequent prosecution for a second offense." *Venable*, 585 F.2d at 74 n.3. Of particular importance, the doctrine operates to bar retrial in cases involving multiple or fragmented trials where previous prosecutions resulted in an acquittal. *Id.* at 75.

**B.     The Conspiracy Count (Count I) Should Be Dismissed Because It Constitutes The Same Offense The Rigases Were Convicted Of In The Earlier Criminal Trial.**

By including a conspiracy count in the instant Indictment, the Government seeks, *for a second time*, to punish these Rigas family members in connection with

722877_6

10

an alleged conspiracy for which they are already incarcerated.  The Government does so by carving out a smaller tax evasion conspiracy based upon the same operative facts that resulted in the first conviction.  The Double Jeopardy Clause of the United States Constitution prohibits this sort of selective and consecutive prosecution.  Thus, the conspiracy count should be dismissed.

### 1.    Legal standard.

In the context of successive conspiracy prosecutions, the Third Circuit is clear that the Double Jeopardy Clause prohibits the Government "from splitting one conspiracy into several prosecutions." *Becker*, 892 F.2d at 268; *see also United States v. Young*, 503 F.2d 1072, 1075 (3d Cir. 1974) ("a single conspiracy may not be subdivided arbitrarily for the purposes of prosecution"); *United States v. Yancy*, No. 94-366-2, 1995 U.S. Dist. LEXIS 12869, *8 (E.D. Pa. Sept. 7, 1995) ("The government may not artificially divide a single conspiracy into several and prosecute the defendant for each.") (attached hereto as Exhibit "G").

Notably, if a defendant makes a non-frivolous showing that a second indictment is for the same offense for which he was formerly in jeopardy, "the burden of persuasion shifts to the government to prove by a preponderance of evidence that the two indictments charge the defendant with legally separate crimes." *United States v. Liotard*, 817 F.2d 1074, 1077 (3d Cir. 1987); *United States v. Inmon*, 568 F.2d 326, 332 (3d Cir. 1977).

11

722877_6

In deciding whether a defendant has set out a non-frivolous claim, courts apply a "totality of the circumstances" test to "determine whether two groups of conspirators alleged by the government to have entered separate agreements are actually all committed to the same set of objectives in a single conspiracy." *United States v. Smith*, 82 F.3d 1261, 1271 (3d Cir. 1996); *Liotard*, 817 F.2d at 1078. The totality of circumstances test is necessary to prevent the Double Jeopardy Clause from being "subverted by artful pleading or by the selective and strategic reservation of evidence in one prosecution so that it can be used in a subsequent one premised upon the same agreement." *Smith*, 82 F.3d at 1267. If the same agreement forms the basis for both conspiracies, a court should find that the Double Jeopardy Clause is offended and the later prosecution barred. *Id.*

The totality of the circumstances test considers the following four factors: (1) the locus criminis of the two alleged conspiracies; (2) the degree of temporal overlap between the two alleged conspiracies; (3) the degree of personnel overlap between the two conspiracies; and (4) the similarity of overt acts charged and the role played by the defendants in each conspiracy. *See Liotard*, 817 F.2d at 1078. A defendant makes a non-frivolous showing whenever a consideration of the factors "reveals a degree of participant overlap, which together with other facts, permits an inference that members of each alleged conspiracy were aware of the activities and objectives of the other conspiracy and had some interest in the

12

accomplishment of those objectives." *Smith*, 82 F.3d at 1271; *see also id.* ("the defendant need only be able to identify alleged facts and other evidence which, if credited, gives reason to believe that any alleged conspiratorial activity was in furtherance of a single conspiracy ... ."). Moreover, "there is a strong (if not overwhelming) inference that only one conspiracy exists" where "the evidence shows that the two alleged conspiracies are generally of the same time, and in the same location, and among the same parties, and that the parties are performing similar functions... ." *United States v. Brown*, No. 89-463-02, 1991 U.S. Dist. LEXIS 598, *12 (E.D. Pa. 1991) (attached hereto as Exhibit "H"); *see also Inmon*, 568 F.2d at 329 (finding non-frivolous showing made where two indictments "had the same locus, the same objects, and several of the same participants").

Significantly, the Third Circuit has expressly refused to consider as one of the totality of circumstances factors whether the statutory offenses charged in the indictments are different, finding that such a consideration "might lead to irrational results." *Liotard*, 817 F.2d at 1078 n.7 (referring to any difference between statutory offenses "immaterial and fortuitous"). Thus, the fact that the instant Indictment alleges conspiracy to commit tax evasion as opposed to conspiracy to commit securities fraud is irrelevant for purposes of determining whether the Double Jeopardy Clause has been offended.

2.    **The Rigases have made a non-frivolous showing that the indictments allege a single conspiracy.**

Each of the factors that this Court must consider under the totality of circumstances test definitively establishes that the Rigases' constitutional rights under the Double Jeopardy Clause will be violated if the Government is permitted to prosecute this conspiracy charge.

(a)    **The conspiracies share a common locus criminis.**

Locus criminis is defined as the "locality of a crime; the place where a crime was committed." *Smith,* 82 F.3d at 1268 (quoting BLACK'S LAW DICTIONARY 941 (6th ed. 1990)). Where two conspiracies begin at the same geographic location, the Third Circuit has concluded that the locus criminis is the same for both. *Smith,* 82 F.3d at 1268; *see also Liotard,* 817 F.2d at 1079 (finding a common locus criminis where the initial theft underlying both conspiracies arose in New Jersey and concluding that "later sojourns [of the proceeds] to different spots ... is immaterial").

*Smith* involved a defendant charged, in two separate indictments, with conspiring to defraud his employer through a kickback scheme. 82 F.3d at 1264-65. The Government contended that the acts charged differed insofar as one involved conduct occurring in Kentucky, while the other related to conduct undertaken in New Jersey. *Id.* at 1268. The Third Circuit disagreed after finding

summary

that the "primary locations" of both conspiracies was where the employer was headquartered and the money was diverted (Rhode Island) and where the defendant allegedly received the kickbacks (Kentucky). *Id.* Thus, because the events underlying the defendant's indictments "commence and end at the same spots ... the geography of his alleged criminal activity is consistent with the existence of what he describes as an over-arching conspiracy." *Id.*

Here, it is clear that the crimes charged in both indictments were allegedly committed in the town of Coudersport, Pennsylvania, as the Defendants lived and worked there, Adelphia was headquartered there and any proceeds of the Defendants' purported criminal acts were obtained within the confines of Pennsylvania. Thus, Coudersport, Pennsylvania is plainly the locus criminis for the conspiracies forming the basis for each indictment.

> **(b)     The conspiracies have a significant degree of temporal overlap.**

The second factor focuses on whether the two conspiracies share a significant degree of temporal overlap. In instances where the time period of one conspiracy is largely subsumed within the other, courts conclude that the factor weighs in favor of the finding of a singular, indivisible, conspiracy. *Smith*, 82 F.3d at 1269; *Liotard*, 817 F.2d at 1079; *United States v. Felton*, 735 F.2d 276, 278 (3d Cir. 1985).

722877_6

The allegations contained within the indictments reflect a significant, if not complete, temporal overlap.  Specifically, the S.D.N.Y. indictment states that its conspiracy ranges from 1999 through May 2002.  Ex. B, ¶ 198.  The conspiracy in the instant Indictment covers a broader time period, as it discusses a scheme supposedly perpetrated from 1996 through 2002.  Ex. A at Manner & Means, ¶¶ 9-12; *id.* at Overt Acts, ¶¶ 7-17, 19.  The periods overlap by at least four years – from 1999 through 2002 – and the earlier indictment is completely subsumed within the current Indictment.  Thus, there is a significant degree of temporal overlap between the two conspiracies.  *See Liotard*, 817 F.2d at 1079 (finding factor satisfied where earlier indictment subsumed within time period of second indictment).

(c)     <strong>The conspiracies have a significant degree of personnel overlap.</strong>

The involvement of similar coconspirators in both conspiracies goes toward establishing this factor.  *See Liotard*, 817 F.2d at 1079.  When the same principal coconspirators are involved in the activities surrounding each conspiracy, it is inferred that the conspiracies are of a singular nature.  *Smith*, 82 F.3d at 1269; *see also Liotard*, 817 F.2d at 1079 (factor satisfied where same individual is a coconspirator in each indictment).  Further, if the activities of the coconspirators "are interdependent and mutually supportive to any degree, the inference becomes

722877_6

compelling that the participants are involved in but one conspiracy." *Smith*, 82 F.3d at 1269.

Here, the Rigases were named as coconspirators in each indictment. According to the Government, both individuals were intimately involved in the overt acts evidencing the alleged conspiracies.   To that end, though other coconspirators were named in the S.D.N.Y. case, the actions of John and Tim were featured prominently in that case.  Indeed, Michael Rigas and Michael Mulcahey, the only named coconspirators to be tried in the S.D.N.Y. case, were acquitted of conspiracy. *See* Ex. E.

Further, the acts alleged in the two indictments were interdependent and mutually supportive.  Specifically, the S.D.N.Y. indictment charged the Rigases with conspiring to commit a variety of federal offenses, all of which involved the looting of Adelphia.  The instant Indictment alleges much of this same conduct (*i.e.* misappropriation of Adelphia funds), albeit with the added charge that the Rigases failed to report the fruits of the conspiracy as income on their tax returns. Moreover, if the Government is believed, the conspirators in each scheme were interdependent insofar as the current tax evasion conspiracy facilitated the hiding of any ill-gotten gains – and thus permitted the supposed pilfering of Adelphia to continue undetected for a longer period of time.   Similarly, *Liotard* involved multiple prosecutions of a shipping company's employees related to a conspiracy

722877 6

to steal goods and vehicles from the company. 817 F.2d at 1076. In the course of deciding that the two prosecutions related to the same conspiracy, the court noted that the overall goals of each conspiracy was the same -- namely, the personal enrichment of the employees and the financial ruination of the company. *Id.* at 1077, 1079 n.8 (framing the defendants' agreement as "a general plan to steal" from their employer). Thus, it is clear that the conspiracies have a significant degree of personnel overlap.[3]

> **(d)   The conspiracies charge similar overt acts undertaken and roles played by the defendants.**

The proper focus of this inquiry is on the amount of overlap in overt acts charged within each indictment and the defendants' respective roles in each conspiracy.

> **(i)   The overt acts charged in each indictment substantially overlap.**

A comparison of the Indictment in the tax case to the previous indictment and Bill of Particulars in the S.D.N.Y. case illustrates that many of the allegations regarding the "manner and means of the conspiracy" seem conspicuously similar: that the conspirators created a complex network of family owned corporations to

---

[3] Count One of the tax Indictment charges that the Rigases conspired with "other individuals both known and unknown to the grand jury." Ex. A.  The government has not identified these alleged unindicted coconspirators; however, the substance of the indictments yields the inference that these unnamed individuals are substantially, if not exactly, the same individuals identified in the S.D.N.Y. Bill of Particulars. *See* Ex. C at ¶ 101.

722877_6

receive and hold money diverted from Adelphia's accounts; that, in order to make the transfers look legitimate to the public and outside auditors, they caused entries to be made into Adelphia's accounting system; that they treated the diverted funds as inter-company receivables or money owed to Adelphia by the RFEs; that they misled Adelphia's outside auditors and accountants concerning the true purpose of the diverted funds; and that the objective of these actions was to divert Adelphia's assets to the Rigases personally, while concealing that personal gain from non-conspirators.

For instance, the present conspiracy count alleges that the Rigases obstructed the IRS in its collection of over $300 million in individual taxes. Ex. A, pp. 2-3. The taxes purportedly arose from income received by the Rigases by virtue of certain acts of self-dealing between the Rigases and Adelphia from 1996-2002. For example, the tax Indictment alleges that the conspirators caused Adelphia to transfer billions of dollars to members of the Rigas families and certain Rigas Family Entities ("RFEs") during that time period. *Id.* at Manner & Means, ¶¶ 2-3. These transfers were allegedly used by the Rigases in the following ways: (1) to buy stock and cover margin loans (*id.* at Overt Acts, ¶¶ 18-19), (2) to provide a monthly stipend to John Rigas totaling $1 million (*id.* at Manner & Means, ¶ 3), (3) to provide various payments to Rigas family members (*id.* at Manner & Means, ¶ 3; *id* at Overt Acts, ¶¶ 9-18), and (4) to construct a golf course in Coudersport

19

(*id.* at Overt Acts, ¶ 17). The tax Indictment also mentions misuse of a corporate airplane (*id.*).

The S.D.N.Y. indictment and associated Bill of Particulars alleged much of this same conduct within its "The Scheme To Defraud" and "Conspiracy" sections. In particular, the indictment mentioned the same transfers of Adelphia funds to the Rigases: (1) to buy stock and cover margin loans (Ex. B, ¶¶ 73-91, 174-86, 204d, 204s; 205f); (2) to provide a monthly stipend to John Rigas totaling $1 million (*id.* at ¶¶ 171-72), (3) to provide various payments to Rigas family members (*id.* at ¶¶ 167-73) and (4) to construct a golf course in Coudersport (*id.* at ¶¶ 62, 205b). Similarly, it discussed (this time in great detail) the Rigases' supposedly improper use of the Adelphia airplane (*id.* at ¶¶ 62, 191-97; Ex. B, ¶¶ 102-06).

Similarly, both indictments claim that the Rigases manipulated Adelphia's internal accounting system and misled Adelphia's outside auditors as part of the overarching scheme to divert money from the company. *See* Ex. A at Manner & Means, ¶ 4-7; *id.* at Overt Acts, ¶ 8; Ex. B, ¶¶ 204d, 204g-h.

Thus, the averments contained within the respective indictments plainly demonstrate a significant degree of overlap in the overt acts alleged against the Defendants.

722877_6

### (ii) The indictments allege that John and Tim played central roles in both conspiracies.

Distilled to their simplest terms, the two conspiracies allege that members of the Rigas family abused their positions as directors and officers of Adelphia in order to divert Adelphia's assets to themselves. Both indictments contend that John and Tim effectively controlled Adelphia and all its assets. *See* Ex. A at General Allegations, ¶¶ 6-7; Ex. B, ¶ 167. This degree of power, the Government's theory continues, made it possible for the Rigases to accomplish the illicit objectives alleged within the balance of the indictments.[4] Thus, John and Tim occupied similar roles in both conspiracies. *See Smith*, 82 F.3d at 1269 (finding roles "virtually identical" where defendant used his influence, corporate position and relationships to accomplish objectives of conspiracy).

A comparison of the S.D.N.Y. indictment and the one forming the basis for this proceeding makes clear that the Government is now attempting to punish the Rigases a second time for the same conspiracy for which they have already been convicted. Taking the Government's contentions in each indictment at face value, the Rigases have clearly made a non-frivolous showing that the Defendants are being exposed to constitutionally-impermissible duplicative prosecution on the

---

[4] Though most of the activities were pled collectively against John and Tim in both indictments, at least one series of allegations lends additional credence to the fact that the Defendants' occupied a similar role in each alleged conspiracy. Specifically, each indictment charges Tim with procuring from Adelphia a $1,000,000 yearly stipend for John. Ex. A at Overt Acts, ¶ 16; Ex. B, ¶¶ 171-72.

21

conspiracy charge.  Accordingly, this Court should dismiss the conspiracy count of the instant Indictment.  At minimum, it should grant the Rigases an evidentiary hearing at which the Government would be required to prove that the two indictments charge the Rigases with legally separate conspiracies.

**C.     The Tax Evasion Counts (Counts II-VII) Should Be Dismissed Because The Rigases Were Previously Acquitted Of An Element Necessary To Sustain Convictions On These Counts.**

The substantive tax evasion counts against the Rigases must be dismissed under the principles of collateral estoppel.  Courts applying the collateral estoppel doctrine will dismiss an indictment wherever facts established in a defendant's favor in the initial prosecution are necessary to sustain a conviction in the subsequent proceeding.  *Venable*, 585 F.2d at 78.  Thus, a court must first decide which facts were decided against the Government in the earlier proceeding.  *United States v. Triano*, 393 F. Supp. 1061, 1068 (D. N.J. 1975).  Then, the court must determine whether the Government can prove the crime charged without relying on the facts previously resolved in the defendant's favor.  *Id.*  If it appears as though the Government is unable to prove its case without relying on the previously adjudicated issue, then collateral estoppel will operate to bar the subsequent proceeding.  *Venable*, 585 F.2d at 78.

722877_6

1.    **The Rigases' prior acquittals established that they did not "steal" or "divert" Adelphia's corporate assets.**

In determining whether the issue sought to be concluded was decided in the defendant's favor in the earlier proceeding, this Court must apply the collateral estoppel doctrine with "realism and rationality" and "viewed with an eye to all the circumstances of the proceedings." *Ashe*, 397 U.S. at 444 (internal quotations omitted). To that end, when the prior trial yielded a general jury verdict, a court passing on the question of collateral estoppel must examine the entire record of the earlier proceeding in order to determine what the jury actually decided in the defendant's favor. *Id.* (noting that court should take into account "the pleadings, evidence, charge, and other relevant matter"); *see also United States v. Kamins*, 479 F. Supp. 1374, 1377 (W.D. Pa. 1979) ("...the double jeopardy decision turns not on the nature of the charges alone, but also on what actually transpired at the first trial."); *Kamins*, 479 F. Supp. at 1377 (it is appropriate for a court to consider the arguments of counsel in the earlier proceeding in order to glean the substance of the facts ultimately determined).

A review of the entire record from the S.D.N.Y. proceedings, highlighted by the Government's closing argument to the jury, leads to the inescapable conclusion that the critical fact of whether the Rigases diverted assets from Adelphia was decided against the Government in the first criminal trial when the Rigases were acquitted of wire fraud. In this regard, the elements of wire fraud under 18 U.S.C.

23

§ 1343 are the existence of a scheme to defraud and the use of interstate communications in furtherance of the scheme. *United States v. Cen-Card Agency/C.C.A.C.*, 724 F. Supp. 313, 316 (D. N.J. 1989). As part of the scheme to defraud, the Government must prove that that a defendant acted with the specific intent of causing some financial or property loss to another. *United States v. Mezvinsky*, 206 F. Supp. 2d 661, 668 (E.D. Pa. 2002).

In the S.D.N.Y. case, the *only* plausible interpretation of the jury's verdict of acquittal is that the Rigases did not engage in the scheme to defraud charged by the government. *See Ashe*, 397 U.S. at 444-45 (where the accused's defense was that he was not present at a poker game robbery, his acquittal of robbing one participant necessarily foreclosed a subsequent prosecution for robbing a different participant).[5]

---

[5] In *Ashe*, the Court noted that although the crime of armed robbery has multiple elements, the record was devoid of any evidence that any rational juror could have based an acquittal on a finding than an armed robbery had not occurred or that the alleged victim was not robbed. As the Court reasoned:

> If a later court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest, the possibility of multiplicity of prosecutions is staggering.... In fact, such a restrictive definition of 'determined' amounts simply to a rejection of collateral estoppel, since it is impossible to imagine a statutory offense in which the government has to prove only one element or issue to sustain a conviction.

397 U.S. at 444, n. 9 (ellipsis in original; citation omitted).

722877_6

As detailed above, it is clear that the Government's wire fraud theory in the S.D.N.Y. case was that the Rigases' alleged scheme to defraud involved acting with the specific intent to cause harm to Adelphia by, among other things, looting it of cash and securities. These acts included causing Adelphia to transfer hundreds of millions of dollars to Rigas Family Entities ("RFEs") during that time period. Ex. A at Manner & Means, ¶¶ 2-3. The money was supposedly used to provide, among other things, a monthly stipend to John Rigas totaling $1 million (*id.* at Manner & Means, ¶ 3) and various payments to Rigas family members (*id.* at Manner & Means, ¶ 3; *id* at Overt Acts, ¶¶ 9-18).

Nowhere within the current Indictment does the Government charge any type of conduct other than these aforementioned acts of self-dealing. Every one of the transactions which the Government alleges in this case constituted "diversion" of either Adelphia cash or securities by the Rigases was previously the subject of the Government's wire fraud claims in the 2004 criminal trial.[6] Thus, these very

---

[6] To the extent that the Government takes the position that the wire fraud counts outlined in the S.D.N.Y. indictment were limited to the five specific wire transmissions described in paragraphs 208 and 209 of the indictment, such a narrow interpretation is belied by a number of irrefutable facts. First, the same section of the indictment incorporates and includes each of the allegations of misconduct set out in the balance of the indictment. Ex. B, ¶ 208 ("The allegations contained in paragraphs 1-197 and 204-05 of this Indictment are repeated and realleged as if fully set forth herein."). Additionally, the Government confirmed, in representations made during the charge conference, that the wire fraud charges included a plethora of allegations beyond merely those specifically listed within the body of those specific wire transfer counts. *See* Charge Conference, p. 88; a

same allegations of theft from Adelphia were necessarily rejected by the jury in the

S.D.N.Y. trial when it acquitted the Rigases of wire fraud. *See* Ex. E.

> 2. **The Government cannot prosecute the Rigases for failing to pay taxes on diverted corporate assets that the Rigases were acquitted of diverting.**

The Government's theory in this case is that the Rigases failed to pay federal

taxes on the Adelphia corporate assets that they diverted for their own personal

use. Ex. A at Manner & Means, ¶¶ 1-4. As explained above, however, the

Government's claim that those assets were diverted has already been rejected by a

federal jury. The Constitution forbids the Government from putting the Rigases at

risk a second time for matters that have already been resolved in their favor.

*United States v. Crispino*, 586 F. Supp. 1525, 1534 (D. N.J. 1984). As noted by

one district court: "In music or athletics, there is much to be said for practicing

until one 'gets it right.' Fortunately, the Fifth Amendment and the doctrine of

collateral estoppel do not allow federal prosecutors the same luxury with respect to

successive criminal prosecutions." *Id.* at 1535.

---

copy of which is attached hereto as Exhibit "1" (including a representation by Assistant U.S. Attorney Clark that "the wire fraud count incorporates all of the paragraphs of the conspiracy allegations of the indictment and we are going to argue accordingly"). Finally, the Government's closing argument to the jury, as discussed elsewhere in this Brief, made clear that its theory of wire fraud consisted of numerous allegations that the Rigases took cash and stock from Adelphia and was not focused on a specific sub-set of wire transactions.

722877_6

The Government cannot avoid dismissal by adding a "taxable event" layer to the instant prosecution. *Crispino* is highly instructive. In that case, the court was faced with an indictment charging defendant Crispino with under-reporting his taxable income in violation of 26 U.S.C. § 7201. Crispino had previously been charged with conspiring and participating in a criminal enterprise to import and distribute marijuana and methaqualone. *Id.* However, he was acquitted of all these charges at an earlier trial. *Id.* Relying on the concept of collateral estoppel, the court precluded the Government from introducing any evidence at the subsequent trial which had been the subject of Crispino's prior acquittal (i.e., any evidence related to his participation in the drug distribution enterprise). *Id.* at 1534.

In reaching this decision, the court adopted the reasoning of a case from the Court of Appeal for the Fifth Circuit – *United States v. Mock*, 604 F.2d 341 (5th Cir. 1979). *Mock* involved a subsequent prosecution for tax evasion following an earlier acquittal for involvement in a criminal enterprise. 604 F.2d at 342. In overturning the subsequent tax evasion conviction, the appeals court made the following pertinent observations:

> *The problem here is that the government urged in the tax evasion case that appellant received income from the very conspiracy operation of which he had been acquitted in the first trial.* ... The government based its case upon the very theory that appellant derived income from the conspiracy of which he already had been acquitted. ... It matters not that appellant's acquittal on the conspiracy charge does not negate the possibility that

722877_6

> he may otherwise have derived income from the sale or
> distribution of marijuana. ***The fundamental error here
> is that the government reintroduced the identical facts
> and theory of the facts which were rejected at the first
> trial.***

*Id.* at 344-45 (emphasis added).

The same can be said here, where the Government bases its tax evasion charges on the alleged "diversion of Adelphia corporate funds." Ex. A at Manner & Means, ¶¶ 2-4. The government theorizes that the Rigases should have paid federal taxes on these allegedly ill-gotten gains. *See e.g., James v. United States*, 366 U.S. 213, 219-20 (1961) ("When a taxpayer acquires earning, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, he has received income which he is required to return … .") (internal quotations omitted). However, such theory simply cannot be proven without relitigating an issue that was already found against Government in the first trial.

While both *Cripino* and *Mock* applied collateral estoppel more narrowly to preclude evidence (and not dismiss a count of an indictment), the doctrine, as discussed previously, is also used within this Circuit to dismiss entire criminal charges where the excluded evidence is necessary to obtain a conviction. *See e.g., Venable*, 585 F.2d at 78. Indeed, the *Crispino* decision acknowledged that collateral estoppel could, in the appropriate situation, bar prosecution where the

28

722877_6

issue precluded is essential for conviction in the second trial.  586 F. Supp. at 1529 n.2.  Here, the Indictment itself makes clear that the Government intends to rely exclusively on a theory that the Rigases obtained income by virtue of their participation in an ongoing scheme of looting Adelphia — the very scheme the Rigases were acquitted of in the earlier criminal proceeding.  Because the Government may not do this, the tax evasion counts of the Indictment must be dismissed.

In sum, the Government simply may not argue that the Rigases received income from the same criminal operation of which they were acquitted in their earlier trial.  *See Mock*, 604 F.2d at 345 ("The fundamental error here is that the government reintroduced the identical facts and theory of the facts which were rejected at the first trial.").  It is clear that the Government cannot prove the tax evasion counts without relying on facts determined in the Rigases' favor during the S.D.N.Y. proceeding.  Thus, this Court should dismiss the tax evasions counts of the Indictment. *See Venable*, 585 F.2d at 78.

722877_6

## V.    CONCLUSION

For all of the reasons stated herein, all counts of the Indictment should be dismissed.

Respectfully Submitted,

**DILWORTH PAXSON LLP**

/s/ Joseph U. Metz

Dated:  March 31, 2008

Joseph U. Metz, Esquire
PA Attorney I.D. No: 32958
112 Market Street, 8th Floor
Harrisburg, PA 17101
717-236-4812 – tel / 717-236-7811 - fax
jmetz@dilworthlaw.com

Lawrence G. McMichael, Esquire
PA Attorney I.D. No: 28550
1735 Market Street, Suite 3200
Philadelphia, Pennsylvania 19103
215-575-7000 – tel / 215-575-7200 - fax
lmcmichael@dilworthlaw.com

*Attorneys for Defendants,*
*John J. Rigas and Timothy J. Rigas*

722877 6

30

## CERTIFICATE OF NON-CONCURRENCE

I hereby certify that, counsel for Defendants John J. Rigas and Timothy J. Rigas has sought concurrence from Assistant U.S. Attorney George J. Rocktashel in the Defendants' Motion to Dismiss the Indictment on Double Jeopardy and Collateral Estoppel grounds but that concurrence has not been granted by counsel for the United States of America.

/s/ Joseph U. Metz
Joseph U. Metz (I.D. No: 32958)

DATED:  March 31, 2008

722877_6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | No. 4:05-cr-0402 (Jones, J.) |
| v. | : | |
| | : | |
| JOHN J. RIGAS and | : | |
| TIMOTHY J. RIGAS | : | |
| Defendants. | : | |

## ORDER

**AND NOW**, this ___ day of _____, 2008, upon consideration of the Motion to Dismiss the Indictment on Double Jeopardy and Collateral Estoppel grounds of Defendants John J. Rigas and Timothy J. Rigas, it is hereby **ORDERED AND DECREED** that said Motion **BE AND HEREBY IS GRANTED**.  It is **FURTHER ORDERED** that the Indictment is hereby dismissed.

_____
John E. Jones, III, Judge
Middle District of Pennsylvania

722877_6

## CERTIFICATE OF SERVICE

I hereby state that on the date indicated below, I caused to be served a true and correct copy of the attached Defendants' Motion to Dismiss the Indictment on Double Jeopardy and Collateral Estoppel grounds, Brief in support thereof, proposed Order and Certificate of Non-concurrence via the Court's electronic mailing service and/or by first class mail, postage prepaid, on the following:

George J. Rocktashel
U.S. Attorney's Office
Federal Building
240 W. Third St., Suite 316
Williamsport, PA 17701
*Attorney for the United States of America*
(via ECF and first class mail)

Lorna N. Graham
U.S. Attorney's Office
P.O. Box 309
235 North Washington Avenue
Scranton, PA 18501
*Attorney for the United States of America*
(via ECF and first class mail)

Benard V. Preziosi
Curtis Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue, 35th floor
New York, NY 10178
*Attorney for Defendant, John J. Rigas*
(via ECF only)

Peter E. Fleming
Curtis Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue, 35th floor
New York, NY 10178
*Attorney for Defendant, Timothy J. Rigas*
(via ECF only)

/s/ Joseph U. Metz
Joseph U. Metz (I.D. No: 32958)

Dated:  March 31, 2008

722877_6