**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Criminal No. 4:CR-05-0402 |
| Plaintiff, | : | |
| | : | (Jones, J.) |
| -against- | : | |
| | : | (Electronically Filed) |
| JOHN J. RIGAS and TIMOTHY J. RIGAS, | : | |
| | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
JOHN RIGAS AND TIMOTHY RIGAS' MOTION TO
<u>AMEND THE TERMS OF THEIR CONFINEMENT</u>**


DILWORTH PAXSON LLP          DILWORTH PAXSON LLP
Joseph U. Metz, Esq.              Lawrence G. McMichael, Esq.
Pa. Attorney ID # 32958        Pa. Attorney ID # 28550
112 Market Street, 8th Floor    1735 Market Street, Suite 3200
Harrisburg, PA 17101            Philadelphia, PA 19103


ATTORNEYS FOR DEFENDANTS JOHN J. RIGAS AND TIMOTHY J. RIGAS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................1

II.    BACKGROUND ...................................................................................2

  A.  The SDNY Action ................................................................................2

  B.  The Criminal Tax Case........................................................................4

  C.  Restrictions on Counsel's Access to the Rigases ...........................5

III.   ARGUMENT...........................................................................................9

  A.  The Sixth Amendment Guarantees Effective and Meaningful Assistance of
      Counsel and Applies in the Pre-trial Stage.....................................9

    1.   The Right to Counsel is the Right to Effective Counsel............................11

    2.   The Right to Effective Counsel Extends to a Right to Counsel During the
         Pre-trial Phase. .........................................................................12

    3.   The Restrictions Imposed by Virtue of the Rigases' Incarceration
         Critically Impair Counsel's Ability to "Meet" the Government's Case....16

  B.  Defendants' Current Incarceration Does Not Alter Their Constitutional
      Right to Effective Assistance of Counsel......................................19

  C.  A Temporary Transfer Will Protect the Defendants' Right to a Fair Trial...22

IV.    CONCLUSION...........................................................................................26

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Adams v. United States ex rel. McCann,*
   317 U.S. 269 (1942) ..................................................................................10

*Argersinger v. Hamlin,*
   407 U.S. 25 (1971) ...................................................................................24

*Batchelor v. State,*
   189 Ind. 69; 125 N.E. 773 (Ind. 1920) ..................................................14

*Cobb v. Aytch,*
   643 F.2d 946 (3d Cir. 1981) ....................................................................16

*Cuyler v. Sullivan,*
   446 U.S. 335 (1980) .................................................................................23

*Geders v. United States,*
   425 U.S. 80 (1976) ...................................................................................12

*Gideon v. Wainwright,*
   372 U.S. 335 (1963) ............................................................................ 9, 23

*Herring v. New York,*
   422 U.S. 853 (1975) .................................................................................19

*In re Murchison,*
   349 U.S. 133 (1955) .................................................................................22

*Johnson v. Zerbst,*
   304 U.S. 458 (1938) .................................................................................23

*Kimmelmann v. Morrison,*
   477 U.S. 365 (1986) .................................................................................11

*Lakeside v. Oregon,*
   435 U.S. 333 (1977) ...................................................................................9

*McMann v. Richardson,*
  397 U.S. 759 (1970) ...........................................................................................11

*Moore v. United States,*
  432 F.2d 730 (3rd Cir. 1970)..............................................................................24

*Morrison v. Kimmelmann,*
  752 F. 2d 918 (3d Cir. 1985) .............................................................................10

*Perry v. Leeke,*
  488 U.S. 272 (1989) ...........................................................................................12

*Powell v. Alabama,*
  287 U.S. 45 (1932) ..................................................................................... passim

*Stack v. Boyle,*
  342 U.S. 1 (1951) ...................................................................................... 15, 16

*Strickland v. Washington,*
  466 U.S. 668 (1984) ................................................................................ 9, 10, 28

*Turner v. Safley,*
  482 U.S. 78 (1987) ................................................................................... 20, 21

*United States  v. Cronic,*
  466 U.S. 648 (1984) ................................................................................ 9, 11, 23

*United States. v. Gonzalez-Lopez,*
  548 U.S. 140 (2006) ...........................................................................................25

*United States v. Gallo,*
  763 F.2d 1504 (6th Cir. 1985)............................................................................14

*United States v. King,*
  664 F.2d 1171 (D. Colo. 1981) .................................................................. 14, 15

*United States v. Miles,*
  53 Fed. Appx. 622 (3d Cir. 2002) ......................................................................11

*United States v. Poulsen,*
  2008 WL 161328 (S.D. Ohio Jan. 15, 2008)......................................................14

*United States v. Rigas,*
   490 F.3d 208 (2d Cir. 2007) ...................................................................3

*United States v. Salemo,*
   61 F. 3d 214 (3d Cir. 1995) ............................................................ 9, 10

*United States v. Venuto,*
   182 F.2d 519 (3d Cir. 1950) ................................................................12

*United States v. Wade,*
   388 U.S. 218 (1967) ...........................................................................13

*Wheat v. United States.,*
   486 U.S. 153 (1988) ...........................................................................23

*Wolff v. McDonnell,*
   418 U.S. 539 (1974) ..................................................................... 20, 21

## FEDERAL STATUTES

18 U.S.C. § 3142(b) ................................................................................21

18 U.S.C. § 3622(c)(2).............................................................................22

Defendants, John J. Rigas and Timothy J. Rigas (the "Rigases") hereby submit this Memorandum of Law in support of their Motion to Amend the Terms of Their Confinement.

## I.   **INTRODUCTION**

This case involves the tax implications of numerous complex transactions that occurred over 4 years.  These transactions were accounted for in the books and records of Adelphia Communications Corp. ("Adelphia") and related entities.  The documentary evidence of these transactions consumes literally millions of pages. The Rigases' personal knowledge, based on their experience at Adelphia, and their experience from the preparation of their defense in the criminal case previously brought against them in New York, is critical to preparing a defense in this case.

The complex allegations in the indictment and the nature of the potential evidence pose significant challenges for trial preparation, requiring close and frequent communication between the Rigases and their defense counsel.  However, the Rigases are currently confined at the Federal Corrections Institution - Butner ("FCI – Butner"), a low-security facility located in North Carolina.  Because of this confinement, counsel has not and will not be able to have the access to the Rigases that they need in order to prepare a defense to the government's case against the Rigases.  This lack of adequate consultation between counsel and clients will

severely impinge upon the Rigases' Fifth Amendment right to due process and their Sixth Amendment rights to effective assistance to counsel and a fair trial.

Through this Motion, the Rigases seek a temporary modification of the terms of their confinement in order to enable them and their counsel to prepare a defense. The appropriate modification is temporary home confinement with such security measures as the Court should impose. The modification should be effective immediately (approximately 3 months before trial) and continue through the conclusion of the trial, at which time the Rigases' would report back to prison to continue their respective sentences. The requested modification correctly balances the Rigases' Fifth and Sixth Amendment rights with the interests of the government, because there has already been a judicial determination that the Rigases are neither a danger to the community nor a flight risk. [Transcript from the Rigases' Bail Hearing on 7/13/05 ("Bail Tr."), p. 9, attached as Exhibit A.] Therefore, the Rigases respectfully request that this Court order them to be transferred to home confinement for the pendency of the pre-trial and trial stages.

## II.   BACKGROUND

### A.   The SDNY Action

On July 8, 2004, John Rigas and Timothy Rigas were convicted in the United States District Court for the Southern District of New York (the "SDNY action") of securities fraud and bank fraud, as well as the charge of conspiracy to

commit securities fraud and bank fraud.   The jury acquitted John Rigas and Timothy Rigas of wire fraud and of conspiracy to commit wire fraud.  On June 20, 2005, John Rigas was sentenced to 15 years in prison and Timothy Rigas was sentenced to 20 years in prison.

The Rigases subsequently appealed their convictions to the Second Circuit Court of Appeals.  Finding that the Rigases were neither flight risks nor risks to society and that their appellate issues raised serious questions, Judge Sand permitted the Rigases to remain free while their appeal was pending.  On May 24, 2007, the Second Circuit reversed the Rigases' conviction on Count 23 (one of the bank fraud charges) and remanded for an entry of acquittal.  *United States v. Rigas*, 490 F.3d 208, 239 (2d Cir. 2007).  The Second Circuit affirmed the remaining counts.  *Id*.  With the appeal resolved, on June 27, 2007, Judge Sand revoked the Rigases' bail pending appeal and ordered that they report to prison, which they did on August 13, 2007.  Since that time, the Rigases have been serving their respective sentences at FCI - Butner.

The main government witness during the SDNY action was James Brown ("Brown").  Despite pleading guilty to the same charges that the Rigases were convicted of, Brown has still not been sentenced for his crimes.  Unlike the Rigases, he remains free and able to meet with the government whenever it so desires.  Notably, in the SDNY action, Brown testified that he spent 400-500 hours

with the government to prepare the case against the Rigases.  [Transcript from *United States v. Rigas*, 02-cr-1236 (S.D.N.Y. filed June 24, 2002) at 7163, attached as Exhibit B.]

## B.   The Criminal Tax Case

This criminal tax case was brought against the Rigases after the conclusion of the SDNY action and after they had already been sentenced to prison for 15 years (John Rigas) and 20 years (Timothy Rigas).  The government's theory in this case is that the Rigases stole money or stock from Adelphia and, as a result, should have paid federal taxes on these allegedly ill-gotten gains.  The government has provided Rigas defense counsel with a series of specific transactions that it contends constituted theft from Adelphia and, therefore, gave rise to a tax liability for the Rigases.  These transactions can be broken down into two basic categories: (1) alleged wire transfers to John Rigas amounting to approximately $60 million; and (2) approximately 10-15 transactions relating to certain purchases of Adelphia securities by the Rigases (numbering in the hundreds of millions of dollars) between 1998 and 2000.  Each of the transactions at issue involve numerous accounting entries and complicated analyses relating to the flow of funds within Adelphia's intricate cash management system.

In this case alone, the government has produced 68 compact disks containing documents relevant to the transactions at issue.  If printed, these

documents would fill a good sized room.  In addition, in the SDNY action, which dealt with many, if not all, of the same transactions as this case, over ten million documents were produced.  Because of funding issues in the SDNY action, the Rigas family themselves (as opposed to their attorneys) reviewed many of these millions of documents produced and are, therefore, an important source of information regarding the substance of this evidence.  Much of the work product based upon Timothy Rigas' review of these documents is stored electronically on his personal computer.

The trial in the instant case is scheduled to commence July 7, 2008 and is likely to last eight to ten weeks.

### C.      Restrictions on Counsel's Access to the Rigases

Since August 2007, counsel for the Rigases have made numerous trips to meet with the Rigases in FCI-Butner to discuss this case as well as other civil and criminal issues.  [Declaration of Lawrence G. McMichael dated April 14, 2008 ("McMichael Decl."), ¶ 3, attached as Exhibit C.]  Despite numerous requests for accommodation, the prison severely restricts counsel's access to their clients. [McMichael Decl. ¶ 4.]

Counsel is only permitted to meet with the Rigases during normal visiting hours and only with advance notice.  [McMichael Decl. ¶ 5.]  Normal weekday visiting hours are Monday, 8:30-3:00, and Thursday and Friday, 2:30-8:00.

[McMichael Decl. ¶ 6.]  Thus, counsel is restricted to meeting with the Rigases for a maximum of 11.5 business hours per week.  In reality, however, because of the time it takes for visitors to be processed in and out of the facility and for the Rigases to be brought to the visitation area, the actual amount of time available for meeting is considerably less.  Indeed, it is not unusual for processing in to the prison to take a half of an hour to one hour.  Even then, counsel often has to wait for the Rigases to be processed into the visitation area.  [McMichael Decl. ¶ 7.]

In addition to the restrictions on visiting hours, counsel is also not permitted to discuss legal issues with the Rigases unless they are in the one, small attorney conference room attached to the visitation area.  [McMichael Decl. ¶ 8.]  That conference room is made available on a first come, first served basis and cannot be reserved in advance.  [McMichael Decl. ¶ 8.]  Therefore, if another attorney is using the room, counsel cannot discuss legal issues with the Rigases unless and until the room is empty.  Counsel is also not permitted to take notes or refer to documents outside of the conference room.  [McMichael Decl. ¶ 9.]  Moreover, only the Rigases and counsel are permitted to use the conference room.  No other visitors, including family members who participated in the review of the millions of documents relevant to this action nor potential witnesses familiar with such documents and/or the internal working of the Adelphia cash management system, are permitted in the attorney conference room.  [McMichael Decl. ¶ 10.]  Because

legal issues cannot be discussed outside of the attorney conference room, there is no ability for the Rigases to meaningfully participate in preparing their defense with family members and potential witnesses while they are incarcerated. [McMichael Decl. ¶ 11.]

Counsel is also limited in terms of what can be brought into the prison. For example, counsel is limited to bringing in a small amount of documents that he or she can carry. Boxes of documents are not permitted. [McMichael Decl. ¶ 12.] Even if they were, given the enormous number of documents relevant to this action, it would be impossible for counsel to transport them to and from the prison even in limited amounts. [McMichael Decl. ¶ 12.] Indeed, because of the sheer volume of documents in this case, the vast majority of documents have been produced by the government in electronic form, including the 68 compact disks produced in this case. [McMichael Decl. ¶ 12.] Yet, counsel is not permitted to bring electronic equipment into the prison, including computers, and, therefore, cannot review pertinent information with the Rigases. [McMichael Decl. ¶ 12.]

For their part, the Rigases are only permitted to bring a small amount of documents to the visitation room and are afforded no access to computers for the purpose of reviewing electronic documents. [McMichael Decl. ¶ 13.] The restriction on computer access is particularly troubling given that much of the Rigases' prior review of the millions of documents is contained in electronic files

7

on computers to which they have no access.  [McMichael Decl. ¶ 13.]  Moreover, the Rigases are limited in the amount of documents that can be stored in their rooms.  They are only permitted a one-and-a half-by-two-and-a-half-foot locker for storage.  [McMichael Decl. ¶ 13.]

The flow of information from counsel to the Rigases is also hampered by the fact that there is also no means of sending documents to the Rigases other than via regular mail.  [McMichael Decl. ¶ 14.]  Overnight delivery services and hand deliveries are not accepted.  Therefore, absent an in-person visit, it usually takes more than a week for written information to be exchanged between the Rigases and their counsel.  [McMichael Decl. ¶ 14.]

Finally, telephonic communications between the Rigases and counsel is restricted.  Counsel cannot call the Rigases, and the Rigases' calls to counsel are limited to 15 minute increments.  [McMichael Decl. ¶ 15.]  Although the Rigases were allocated 100 telephone minutes per month for calls with counsel, that equates to fewer than seven, 15-minute calls per month for each Rigas. [McMichael Decl. ¶ 15.]  Moreover, since the Rigases can only call certain phone numbers, generally these calls must be prearranged.  [McMichael Decl. ¶ 15.] Although counsel has made repeated requests for regularly scheduled conference calls with their clients to ensure continued access, the prison has denied such requests.  [McMichael Decl. ¶ 15.]  The calls are also recorded and monitored,

devaluing the confidential nature of attorney-client communications.  [McMichael Decl. ¶ 15.]

## III.   ARGUMENT

### A.   The Sixth Amendment Guarantees Effective and Meaningful Assistance of Counsel and Applies in the Pre-trial Stage.

The Supreme Court has consistently recognized that "in an adversary system of criminal justice, there is no right more essential than the right to the assistance of counsel." *Lakeside v. Oregon*, 435 U.S. 333, 341 (1977).   The Sixth Amendment right to counsel has consistently been held to be a fundamental right: "An accused's right to be represented by counsel is a fundamental component of our criminal justice system.   Lawyers in criminal cases 'are necessities, not luxuries.'" *United States v. Cronic*, 466 U.S. 648, 653 (1984) (quoting *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)).

The Supreme Court has held that the assistance to counsel is necessary to protect the fundamental right to a fair trial.  *Strickland v. Washington*, 466 U.S. 668, 684 (1984); *see also Gideon v. Wainwright*, 372 U.S. 335, 342, 345 (1963) (recognizing that the Sixth Amendment right to counsel is "fundamental and essential to a fair trial" because "even the intelligent and educated layman . . . requires the guiding hand of counsel at every stage in the proceedings against him."); Indeed "[t]he right to representation by counsel is one of the most fundamental and cherished rights guaranteed by the Constitution." *United States v.*

*Salemo*, 61 F. 3d 214, 221-22 (3d Cir. 1995)  (Alito, J., concurring).  "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled."  *Id*. at 685 (citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275-76 (1942)); *see also Morrison v. Kimmelman* 752 F.2d 918 (3d Cir. 1985).  The Supreme Court further recognized that representation by counsel "is **<u>critical</u>** to the ability . . . to produce just results."  *Strickland*, 466 U.S. at 685 (emphasis added).

But the fundamental right to counsel extended by the Sixth Amendment is not fulfilled by the mere existence of a formal relationship between attorney and client: "[t]hat a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command."  *Strickland*, 466 U.S. at 692.  This basic tenet holds two major truths: (1) that counsel must be permitted to provide, and indeed must provide, representation that is effective and meaningful; and (2) that the assistance that an accused is entitled to, rather than being limited to the trial itself, also extends to pretrial matters.  The current restrictions imposed because of the Rigases' incarceration impinge upon their Sixth Amendment rights to effective assistance of counsel.

10

### 1.      The Right to Counsel is the Right to Effective Counsel.

In order to be meaningful, the right to counsel must consist of more than just a pro forma ability to retain or have appointed counsel.  "The special value of the right to the assistance of counsel explains why '[i]t has long been recognized that the right to counsel is the right to the effective assistance of counsel.'"  *United States v. Cronic*, 466 U.S. at 654 (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970))(alteration in original);  *United States v. Miles*, 53 Fed. Appx. 622, 627 (3d Cir. 2002); *see also Powell v. Alabama*, 287 U.S. 45, 71 (1932) (holding that inadequate case preparation can jeopardize an accused's right to effective assistance of counsel).  Otherwise the right to counsel would be a pretense:  "The constitutional guarantee of counsel, however, 'cannot be satisfied by mere formal appointment.' An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.  In other words, the right to counsel is the right to effective assistance of counsel."  *Kimmelmann v. Morrison*, 477 U.S. 365, 377 (1986) (internal quotations omitted).

The right to effective assistance of counsel, in turn, necessarily implies a right to confer with counsel in a manner free from unnecessary hindrances by the government.  Where the government has restricted access to counsel, the nature and duration of the restriction impacts upon its constitutionality.  Restrictions on

11

lengthy and strategic communications have been found unconstitutional whereas those on short, less critical communications have been upheld. *Compare United States v. Venuto*, 182 F.2d 519, 522 (3rd Cir. 1950) (holding that the federal district court deprived the defendant of his Sixth Amendment right to counsel when it ordered that the defendant not consult with his attorney during an eighteen-hour recess) and *Geders v. United States*, 425 U.S. 80, 91 (1976) (holding a bar on a defendant's communications with his attorney during a seventeen-hour recess at trial violated the constitutional guarantee of assistance of counsel) *with Perry v. Leeke*, 488 U.S. 272 (1989) (holding that a trial court's prohibition on a defendant's communications with his attorney during trial did not violate the Sixth Amendment where it applied only to a fifteen-minute recess between the accused's direct and cross-examination testimony). The current restrictions on the Rigases' communication with their counsel are unconstitutional.

> **2.** **The Right to Effective Counsel Extends to a Right to Counsel During the Pre-trial Phase.**

The right to effective counsel must include, as the Supreme Court has long recognized, the right to utilize counsel even during the time period before the commencement of trial. In order to be meaningful, the right to counsel must not be seriously restricted at any stage of the proceedings. Indeed, this truth is explicit in the language of the Sixth Amendment: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of counsel *for his defence*." U.S.

Constit. amend. VI (emphasis added).  As the Court pronounced in *United States v. Wade*, "[t]he plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defense.'"  388 U.S. 218, 224-25 (1967). Undeniably, the guarantee extends to an accused's right to have access to counsel at any stage after indictment:  "It is central to that principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial."  *Id.* at 226 (internal citations omitted).

In fact, pretrial proceedings are at least as important as the trial itself, as a result of the government's size and resources.  "[T]oday's law enforcement machinery involves critical confrontations of the accused by the prosecution at pretrial proceedings where the results might well settle the accused's fate and reduce the trial itself to a mere formality."  *Wade*, 388 U.S. at 224.  As early as 1932, in the Court's landmark Sixth Amendment assistance of counsel case, *Powell v. Alabama*, the Court recognized that the time between indictment and trial is crucial:  "during perhaps the most critical period of the proceedings . . . that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation were vitally important[,]" defendants are "as much entitled to such aid during that period as at

the trial itself."  287 U.S. 45, 57 (1932); *Batchelor v. State*, 189 Ind. 69, 76; 125 N.E. 773) (Ind. 1920).

Courts have recognized that imprisonment and the restrictions associated therewith during the pre-trial stage may rise to the level of interference with the Sixth Amendment right to counsel.  In *United States v. Poulsen*, 2008 WL 161328 (S.D. Ohio Jan. 15, 2008), the Court held that because the conditions of the defendant's imprisonment made it difficult to work on his case and prevented him from having sustained communication with his counsel, it was necessary to amend the terms of his incarceration in order to not jeopardize his Sixth Amendment right to counsel.  *Poulsen*, 2008 WL 161328, at *3-4.

It has also been recognized that a Court's failure to provide adequate preparation time, especially in a complex federal tax case carrying the risk of serious penalties for the defendant, is a ground to reverse a conviction.  *United States v. King*, 664 F.2d 1171, 1173 (D. Colo. 1981); *see also United States v. Gallo*, 763 F.2d 1504, 1523-24 (6th Cir. 1985) (reversing conviction on Sixth Amendment grounds due to court's denial of adequate pre-trial preparation time in highly complex case).  In *King*, the District Court specifically compared the minimal amount of time the defendant was provided "to research and prepare a defense to a tax fraud charge which the government developed over a three-year period."  *Id*.  To reiterate, the analysis for this Court is not whether the undersigned

counsel is sufficiently competent to address the legal and factual issues that exist, but whether they are prepared to meet the case put forth by the United States attorneys who have the benefit of countless hours and resources in their own preparation of the case.  Without better access to their attorneys, witnesses and the voluminous record, the playing field will have been unconstitutionally tilted against the Rigases.

The courts' overriding concern that a defendant be permitted to prepare his defense is illustrated by the example of pre-trial release under bail.  Under bail, an accused is released pending trial before an adjudication of guilt, after putting up an assurance that he will return, and he enjoys the presumption of innocence until he receives his day in court.  The right to bail is premised on the Eighth Amendment of the Constitution and not, as here, on the Sixth Amendment right to assistance of counsel.  But one of the fundamental purposes of the right to bail – to prepare a defense – is equally at stake in the current situation.  Coupled with the right to have effective and meaningful representation during this stage in the proceedings, this purpose – which is already built into court procedures – exemplifies a judicial philosophy that counsels in favor of the Rigases' temporary transfer to home confinement.  In *Stack v. Boyle*, the Supreme Court found unconstitutional the imposition of excessive bail, indicating that "[t]his traditional right to freedom before conviction permits the unhampered preparation of a defense . . . ."  342 U.S.

1, 4 (1951).   For the same reason – concern for the Rigases' ability to construct an

affirmative and effective defense – the Court should here grant Rigases' request for

a temporary transfer.   Indeed, the Third Circuit Court of Appeals has recognized

not only that the prohibition against excessive bail "bears plainly and directly upon

the ability of charged persons to prepare for trial," but that the prohibition should

also be read as "preventing not merely the fact of detention, but also those forms of

detention that unnecessarily interfere with those liberty interests."  *Cobb v. Aytch*,

643 F.2d 946, 959 (3d Cir. 1981).

> **3.    The Restrictions Imposed by Virtue of the Rigases'
> Incarceration Critically Impair Counsel's Ability to
> "Meet" the Government's Case.**

The Bureau of Prisons' regulations that require wardens "generally may not

limit the frequency of attorney visits since the number of visits necessary is

dependent upon the nature and urgency of the legal problems involved." *See* U.S.

Department of Justice, Federal Bureau of Prisons, Program Statement 1315.07,

Legal Activities, Inmate, § 543.13(b).[1]   Nevertheless, numerous restrictions have

been placed on attorney visits with the Rigases that threaten their Constitutional

rights.

The government cannot deny that the present case is factually and legally

complex, requiring extensive coordination and communication between the

---

[1]     Available at http://www.bop.gov/policy/progstat/1315_007.pdf.

Rigases and their counsel.  Further, the government cannot assert that under the restrictions of their current incarceration at FCI – Butner the Rigases are able to prepare for trial in a manner that does not significantly impede their ability to "meet" the case of the government.  At present, during the business week, the Rigases are only permitted to meet with their counsel on Monday, Thursday and Friday during regular visiting hours.  This ability to meet with counsel is not available if another lawyer is already using the **one** conference room available at the prison.  Counsel is only permitted to bring a small amount of papers to the prison in comparison to the voluminous record comprised of millions of relevant documents and constantly available to the government.  Further, electronic equipment is not permitted inside the prison including laptop computers.  Finally, non-lawyers are not permitted to join the Rigases in meeting with their counsel.

Most importantly, the Rigases' current incarceration makes it impossible for their counsel to adequately prepare them to testify at trial.  It cannot be disputed that, were it not for their present incarceration, the Rigases would be working full-time on their defense by reviewing documents, preparing memoranda and reports for counsel and meeting with their attorneys and experts on a daily basis.  Even if counsel were to spend every conceivable business hour with the Rigases between now and trial, they would not come close to the amount of time that Brown devoted to assisting the government in the SDNY action.  Indeed, if counsel did

not focus on any aspect of the case other than preparing the Rigases for their own testimony, it could not be accomplished in the under 100 hours that would be available for each Defendant between now and this trial under the existing restrictions. Even if 100 hours in the aggregate were sufficient for each Rigas, 100 hours spread out over 3 months time would be patently insufficient especially given the lack of access to relevant documents and evidence.

Such hindrances on the Rigases' ability to confer with and benefit from assistance of counsel would necessarily put the defense in an unfavorable position vis-à-vis the prosecution, which has unrestricted access to the evidence and to numerous local assistant U.S. Attorneys and has no restraints on its ability to confer with its witnesses, including Brown who spent between 400 and 500 hours with the government to prepare its case against the Rigases in the SDNY action. Despite pleading guilty to the same charges that the Rigases were convicted of, Brown remains free to this day and is, therefore, able to devote as much time to preparation of the government's case as it desires. This enormous disparity between prosecution and defense would put at risk the adversarial system that the right to counsel is intended to protect: "the right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the

adversary fact-finding process that has been constitutionalized in the Sixth and Fourteenth Amendments." *Herring v. New York*, 422 U.S. 853, 857 (1975).

The relief being requested is not unreasonable.  The Rigases are not seeking to alter their current sentences.  Instead, they seek a temporary modification of the terms of their confinement and assignment to home confinement in order to prepare for the very complex and document intensive trial in this matter.[2]  In their home confinement, the Rigases are willing to wear appropriate security devices to monitor their movement and are also willing to pay reasonable costs for a security detail to ensure that the terms of this Court's modification are obeyed.

## B.    Defendants' Current Incarceration Does Not Alter Their Constitutional Right to Effective Assistance of Counsel

Outside the context of an incarcerated defendant, similar limitations as those outlined above – *i.e.*, a government pronouncement that a defendant could meet with his lawyer only during set hours and that telephone access between him and his lawyers would be restricted throughout the week – would, without question, violate the constitutional guarantee of effective assistance of counsel.  That the Rigases are serving time for other offenses should not alter this determination, for "[p]rison walls do not form a barrier separating prison inmates from the protections

---

[2]      It should be noted that Judge Sand, previously released the Rigases pending the appeal of their criminal convictions for which they are currently incarcerated upon a specific finding that they were not a flight risk.  [Bail Tr., p. 9.]  Further, John Rigas is currently in a significantly disabled state further eliminating any risk that he would flee if granted the requested relief.

of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (holding that Missouri prison restrictions on inmate correspondence were not facially unconstitutional under the First Amendment but that restrictions on inmate marriages violated the constitutional right to marry). This is especially true in this case where the government made a strategic decision not to try the charges in this case in the SDNY action and, indeed, waited until the Rigases had been sentenced to imprisonment to pursue these claims. The government should not get an "upper hand" at the expense of the Rigases' constitutional rights by strategically timing when to bring prosecutions.

To be sure, the constitutional rights of prisoners must be balanced with the penalogical interests of the state or federal government in the effective administration of the facility, "[b]ut though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974) (holding, *inter alia*, that due process requires written notice to an inmate when faced with disciplinary action, but does not require that inmates have the right to counsel during such proceedings).

The Rigases do not dispute that there must be "mutual accommodation between institutional needs and objectives and the provisions of the Constitution."

*Id.* at 556.   But unlike the situations in *Turner* and *Wolff*, which dealt with the rights that prison authorities must uphold during actual incarceration, here there is no clash between the institutional needs of FCI – Butner and the constitutional rights of the Rigases.   The request to the Court is that the Rigases be removed, temporarily, to a different form of confinement; it has no bearing on the functioning of the prison.   The government does have an interest in ensuring that criminal sentences are carried out and served by those adjudicated guilty of federal crimes, and that federal prisoners do not escape from their imprisonment.   But as to the former point, the Rigases do not ask for a reprieve from their sentences, only that the method of confinement be altered for a short period of time.   As to the latter point, Rigases pose no flight risk or danger to the community, as evidenced by the fact that Judge Sand in the SDNY action permitted them to remain free on bail during the pendency of their appeal, after they were found guilty, and this Court previously allowed the Rigases to remain free on bail pending trial in the current case.   *See* 18 U.S.C. § 3142(b).   Furthermore, the Rigases will submit to necessary prophylactic measures such as electronic monitoring during the term of their home confinement.

By this motion, the Rigases request no release from the imposition of their sentence but only that they be allowed to serve a portion of that sentence under home confinement in Pennsylvania so that they may realize their right to effective

and meaningful assistance of counsel, during "perhaps the most critical period of the proceedings." *Powell*, 287 U.S. at 57.  The form of detention, in transitioning to home confinement from a federal prison with regulations and policies that necessitate curtailments on access to the outside world, will make a huge difference in the type and degree of assistance of counsel the Rigases receive.

Finally, granting this request would place no fiscal burdens on the government.   In fact, it would actually alleviate the government's fiscal responsibility in regard to the Rigases, who would agree to bear the costs of their housing, food, and other incidentals during their home confinement.  *See* 18 U.S.C. § 3622(c)(2) (rules authorizing the Bureau of Prisons to release a prisoner).  As between the only governmental interest that would actually be affected by this request were the Court to grant it – an interest in carrying out the sentence by imprisonment at a federal penitentiary – and the private interest of the Rigases in their constitutional right, this Court should strike that balance in favor of the paramount Sixth Amendment right to assistance of counsel.

## C.     A Temporary Transfer Will Protect the Defendants' Right to a Fair Trial.

The right to effective assistance of counsel is necessary to protect other constitutional guarantees, such as the right to a fair trial, a right that is in turn a fundamental requirement of due process.  *See In re Murchison*, 349 U.S. 133, 136 (1955).  As the Supreme Court has articulated, a defendant's Sixth Amendment

right to effective assistance of counsel is essential to a fair trial. *See Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). The right to effective assistance of counsel "is one of the safeguards of the Sixth Amendment deemed necessary to ensure fundamental human rights of life and liberty." *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938). Without that safeguard, "the right to a trial itself would be of 'little avail,'" *Cronic*, 466 U.S. at 653-54 (quoting *Powell*, 287 U.S. at 68), and "[u]nless the accused receives the effective assistance of counsel, 'a serious risk of injustice infects the trial itself.'" *Id.* at 656 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980)). Moreover, this Court itself has an interest in ensuring that there is a fair trial. "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988).

The restrictive telephone and visitation privileges in prison, the Rigases' distance from the locus of the allegations, their need to review millions of pages of discovery documents, and their need to consult almost daily with their defense team, all make it impossible for the Rigases to be personally involved in their defense unless this Motion is granted. This fact deprives them of their right to a fair trial. A temporary transfer of their confinement from FCI – Butner to home confinement would remedy this constitutional infirmity.

In addition, the inability to meaningfully communicate with the Rigases has severely compromised defense counsel's ability to adhere to the standards of effectiveness imposed upon defense counsel in criminal prosecutions. The terms of Defendants' confinement, although necessary for the security of the facility, handicap Defendants' ability to consult with defense counsel and significantly detract from the defense's ability to investigate thoroughly the facts and law in preparation for trial. *See* ABA Standards Relating to the Defense Function, Standard 4-5.2 Control and Direction of the Case and Standard 4-4.1(a) Duty to Investigate[3] (providing that counsel has a duty to investigate and that certain decisions relating to the conduct of the case are for the Defendant).

To ensure that a trial is fair, the defense must have an adequate opportunity to investigate and prepare for trial. *Powell*, 287 U.S. at 58. In fact, counsel's pretrial role "is often a requisite to the very existence of a fair trial." *See Argersinger v. Hamlin*, 407 U.S. 25, 31 (1971). As the Third Circuit has explained, "[t]he exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance." *Moore v. United States*, 432 F.2d 730, 739 (3rd Cir. 1970) (*en banc*) (footnote omitted).

---

[3]  Available at http://www.abanet.org/crimjust/standards/dfunc_toc.html.

Here, defense counsel's limited access to Defendants has almost entirely cut off the interplay necessary to mount an effective defense.

There is, of course, a distinction between the posture of the Rigases in this case and the postures of defendants in the cases cited above.  In the present case, the Rigases are not challenging the denial of effective assistance in a collateral or appellate posture.  Rather, they are requesting *ex ante* that the Court recognize that the current situation unconstitutionally impinges upon their Sixth Amendment rights and that it cure that defect to ensure fairness and legitimacy.  In this respect, it is not necessary to wait until the trial has concluded to determine whether indeed the Rigases were denied their Sixth Amendment right to the effective assistance of counsel, because while under the Sixth Amendment "[i]t is true enough that the purpose of the rights set forth in that Amendment is to ensure a fair trial; . . . it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair."  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 126 S. Ct. 2557, 2562 (2006) (holding that a violation of the Sixth Amendment right to counsel occurred where government conceded the defendant had been denied counsel of his choice when his counsel was denied pro hac vice status, and that it was not subject to harmless-error analysis).  The Sixth Amendment instead "commands, not that a trial be fair, but that a particular guarantee of fairness be provided . . . ." *Id.*

A transfer to home confinement in Coudersport, Pennsylvania, would protect the Rigases' constitutional rights by enabling them to communicate with counsel daily and without restraint, review documentary evidence on a computer, in the form that it was produced, advise counsel regarding the numerous complex financial transactions and family-owned entities, suggest potential lines of factual investigation, and, most importantly, make informed and well-counseled strategic and tactical decisions regarding their defense.

## IV.  <u>CONCLUSION</u>

In this case, the nature of the allegations requires close communication between the Rigases and their counsel for there to be any assurance of the effective and meaningful assistance of counsel that the Constitution protects and the courts recognize.   The government itself has announced that the case is "one of the largest" of its kind in history. *See* U.S. Department of Justice News Release, October 7, 2005.[4]   And as the Rigases previously submitted in their Memorandum in Support of Unopposed Motion to Continue Trial Date, a motion that was granted by this Court, "[t]he case is unusually complex because of the nature of the charges and the vast numbers of corporate transactions, relationships, and financial transfers that underlie the

---

[4]        Available at http://149.101.1.32/tax/usaopress/2005/txdv05100705.htm.

indictment."[5]   The broad scope of the allegations the government has made in this case undoubtedly means that discovery will entail an enormous volume of complex and detailed documentary evidence.   Counsel estimates that the government has more than one million pages of documents, and trial preparation will necessarily involve scrutinizing a multitude of sophisticated financial transactions between and among numerous entities.   In short, given the breadth of the allegations, the anticipated volume and complexity of discovery, and the intricacy of the financial transactions, the Rigases cannot adequately prepare for trial without having close and frequent communication with their counsel as well as the ability to view in a meaningful manner the anticipated millions of pages of documents.

But the current terms of confinement make such communication impossible. Restricted telephone and visiting privileges, the need to pre-schedule meetings in advance, and the great distance that separates Defendants from the locus of the alleged tax evasion means that Defendants cannot possibly make informed choices regarding case-specific strategic or tactical decisions, defenses, or potential lines of factual investigation.   As the Supreme Court has explained in analogous contexts, such obstacles hamstring the defense because "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on

---

[5]      *See* Docket No. 39.

information supplied by the defendant." *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

In sum, this is not a "run of the mill" criminal case.  It is an enormously complex case with numerous transactions.  Counsel requires the assistance of the Rigases in order to properly defend this case.  This assistance cannot be obtained while the Rigases are incarcerated.  The Rigases' current sentences should not eradicate their rights under the Constitution, which very clearly provides them with the right to effective counsel.

WHEREFORE, the Rigases respectfully request that the Court modify the terms of their incarceration and assign them to home confinement until the completion of the trial in this matter so as to provide them adequate time, ability and resources to prepare their defense.

Respectfully submitted,

DILWORTH PAXSON LLP

/s/Joseph U. Metz
Joseph U. Metz, Esquire
Atty. Id. No. 32958
112 Market Street, 8th Floor
Harrisburg, PA 17101
(717) 236-4812
jmetz@dilworthlaw.com

Lawrence G. McMichael, Esquire
Atty. Id. No. 28550
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000
lmcmichael@dilworthlaw.com

DATED: April 15, 2008